**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**BLUEFIELD DIVISION**

| | | |
|---|---|---|
| **BILLY R. GRAHAM,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO. 1:07-00715** |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**M E M O R A N D U M   O P I N I O N**

This is an action seeking review of the decision of the Commissioner of Social Security

denying Plaintiff's application for Disability Insurance Benefits (DIB), under Title II of the Social

Security Act, 42 U.S.C. §§ 401-433. This case is presently pending before the Court on the parties'

cross-Motions for Judgment on the Pleadings. (Document Nos. 9 and 12.) Both parties have

consented in writing to a decision by the United States Magistrate Judge. (Document Nos. 4 and 5.)

The Plaintiff, Billy R. Graham (hereinafter referred to as "Claimant"), filed an application

for DIB on November 30, 2004 (protective filing date), alleging disability as of July 19, 2004, due

to a ligament tear in the left hand and wrist. (Tr. at 14, 58-60, 64.) The claim was denied initially

and on reconsideration. (Tr. at 33-35, 43-45.) On November 10, 2005, Claimant requested a hearing

before an Administrative Law Judge (ALJ). (Tr. at 47.) The hearing was held on January 5, 2007,

before the Honorable Richard L. Swartz. (Tr. at 500-21.) By decision dated January 12, 2007, the

ALJ determined that Claimant was not entitled to benefits. (Tr. at 14-20.) The ALJ's decision

became the final decision of the Commissioner on September 14, 2007, when the Appeals Council

denied Claimant's request for review. (Tr. at 4-6.) On November 8, 2007, Claimant brought the

present action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g). (Document No. 1.)

Under 42 U.S.C. § 423(d)(5), a claimant for disability has the burden of proving a disability. See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims. 20 C.F.R. §§ 404.1520, 416.920 (2006). If an individual is found "not disabled" at any step, further inquiry is unnecessary. Id. §§ 404.1520(a), 416.920(a). The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment. Id. §§ 404.1520(b), 416.920(b). If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment. Id. §§ 404.1520(c), 416.920(c). If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. Id. §§ 404.1520(d), 416.920(d). If it does, the claimant is found disabled and awarded benefits. Id. If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work. 20 C.F.R. §§ 404.1520(e), 416.920(e). By satisfying inquiry four, the claimant establishes a prima facie case of disability. Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). The burden then shifts to the Commissioner, McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience.

20 C.F.R. §§ 404.1520(f), 416.920(f) (2006). The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. McLamore v. Weinberger, 538 F.2d 572, 574 (4th Cir. 1976).

In this particular case, the ALJ the ALJ determined that Claimant satisfied the first inquiry because he had not engaged in substantial gainful activity since July 19, 2004, his alleged onset date. (Tr. at 16, Finding No. 2.) Under the second inquiry, the ALJ found that Claimant suffered from a "status post left wrist injury on July 19, 2004 and injury on November 29, 2004," which were severe impairments. (Tr. at 16, Finding No. 3.) At the third inquiry, the ALJ concluded that Claimant's impairments did not meet or equal the level of severity of any listing in Appendix 1. (Tr. at 16, Finding No. 4.) The ALJ then found that Claimant had a residual functional capacity for light exertional work as follows:

> Claimant can lift 20 pounds occasionally and 10 pounds frequently, he can stand/walk for 6 hours out of 8, and he can sit for 6 hours out of 8. Claimant is limited in the use of his non-dominant left hand/wrist and may wear a protective device, he cannot be required to climb ropes/ladders/scaffolds, he is limited in his ability to crawl and balance, and he should avoid concentrated exposure to heights, hazards and hazardous machinery.

(Tr. at 17, Finding No. 5.) At step four, the ALJ found that Claimant could not return to his past relevant work. (Tr. at 18, Finding No. 6.) On the basis of testimony of a Vocational Expert ("VE") taken at the administrative hearing, the ALJ concluded that Claimant could perform jobs such as a gate guard/watch guard, parking lot attendant, general office clerk/addresser, and file clerk, at the light level of exertion. (Tr. at 19, Finding No. 10.) On this basis, benefits were denied. (Tr. at 20, Finding No. 11.)

Scope of Review

The sole issue before this Court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence. In <u>Blalock v. Richardson</u>, substantial evidence was defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'

<u>Blalock v. Richardson</u>, 483 F.2d 773, 776 (4th Cir. 1972) (quoting <u>Laws v. Celebrezze</u>, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the Court, is charged with resolving conflicts in the evidence. <u>Hays v. Sullivan</u>, 907 F.2d 1453, 1456 (4th Cir. 1990). Nevertheless, the Courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." <u>Oppenheim v. Finch</u>, 495 F.2d 396, 397 (4th Cir. 1974).

A careful review of the record reveals the decision of the Commissioner is supported by substantial evidence.

Claimant's Background

Claimant was born on November 10, 1977, and was 29 years old at the time of the administrative hearing, January 5, 2007. (Tr. at 18, 58, 512.) Claimant had a high school education and completed vocational training in welding. (Tr. at 19, 69, 512.) In the past, he worked as a skidder operator, truck driver, welder, and construction worker. (Tr. at 18, 65-66, 74-80, 514.)

The Medical Record

The Court has reviewed all the evidence of record, including the medical evidence, and will discuss it below in relation to Claimant's arguments.

4

<u>Claimant's Challenges to the Commissioner's Decision</u>

Claimant alleges that the Commissioner's decision is not supported by substantial evidence because the ALJ erred in (1) failing to evaluate all aspects of Claimant's severe impairment under the Listings of Impairments, (2) discrediting the reports of Claimant's medical providers, and (3) relying upon a hypothetical question to the VE which did not set out fairly all the evidence regarding Claimant's impairments. (Document No. 10 at 6-8.) The Commissioner asserts that Claimant's arguments are without merit and that substantial evidence supports the ALJ's decision. (Document No. 12 at 7-13.)

<u>Analysis</u>.

1. <u>Listing Impairment</u>.

Claimant first alleges that the ALJ failed to consider Claimant's "entitlement to benefits under all of the appropriate listings." (Document No. 10 at 6.) Though Claimant suffered an injury to his left wrist, Claimant asserts that the evidence "makes it clear that there was damage to the soft tissues of his ligaments and wrists as well as the effects of a significant staph infection to that part of his body." (<u>Id.</u>) Claimant therefore, contends that the ALJ failed to consider under the Listings, the soft tissue injury and staph infection aspects of his severe left wrist impairment. (<u>Id.</u>)

The Commissioner asserts that the ALJ properly determined that Claimant's impairment could not meet any musculoskeletal listing, specifically Listing 1.02, because Claimant had no impairment of the right upper extremity. (Document No. 12 at 10.) Though Claimant "now asserts that the ALJ should have somehow found that he met some listed impairment, he makes no attempt to identify any listed impairments that he met and makes no attempt to specifically explain how his impairment meets or equals any listed impairment. (<u>Id.</u>) The Commissioner therefore, contends that

Claimant failed to demonstrate that his left wrist impairment met the criteria of any listed impairment and that the ALJ reasonably concluded that Claimant was not disabled at step three of the sequential analysis. (Id. at 11.)

"The Listing of Impairments . . . describes, for each of the major body systems impairments that we consider to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience. 20 C.F.R. §§ 404.1525(a), 416.925(a) (2006); see Sullivan v. Zebley, 493 U.S. 521, 532, 110 S.Ct. 885, 891, 107 L.Ed.2d 967 (1990). "For a claimant to qualify for benefits by showing that h[er] unlisted impairment, or combination of impairments, is 'equivalent' to a listed impairment, [s]he must present medical findings equal in severity to *all* the criteria for the one most similar listed impairment." See id. at 531 (emphasis in original).

The ALJ considered Claimant's left wrist injuries under Sections 1.01[1] and 1.02. (Tr. at 16-17.) Section 1.02 of the Listing of Impairments covers Major Dysfunction of a joint due to any cause, and provides as follows:

> *1.02 Major dysfunction of a joint(s) (due to any cause)*: Characterized by gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s). With:
> A. Involvement of one major peripheral weight-bearing joint (i.e., hip, knee, or ankle), resulting in inability to ambulate effectively, as defined in 1.00B2b; or
> B. Involvement of one major peripheral joint in each upper extremity (i.e., shoulder, elbow, or wrist-hand), resulting in inability to perform fine and gross

---

[1] Section 1.01 of the Listing of Impairments covers the Category of Impairments, Musculoskeletal, and includes separate Listings 1.02 through 1.08. 20 C.F.R. Pt. 404, Subpt. P., App. 1 § 1.01 (2006).

movements effectively, as defined in 1.00B2c.

20 C.F.R. Pt. 404, Subpt. P., App. 1 § 1.02 (2006).

The ALJ determined that "the current evidence fails to establish an impairment that is accompanied by signs that are reflective of listing level severity." (Tr. at 16.) Though specifically not stated by the ALJ in his decision, it is clear that Claimant failed to meet § 1.02 because he had no impairment of the right upper extremity.

Though Claimant does not cite any specific listing under which the ALJ failed to consider his severe impairment, he mentions the damage to the soft tissues of his ligaments and wrists and the effects of a significant staph infection to his wrist. (Document No. 10 at 6.) Section 1.08 of the Listing of Impairments, which is encompassed under Section 1.01, and was cited by the ALJ in his decision, covers Soft Tissue Injuries, and provides as follows:

> 1.08 *Soft tissue injury* (e.g., burns) of an upper or lower extremity, trunk, or face and head, under continuing surgical management, as defined in 1.00M, directed toward the salvage or restoration of major function, and such major function was not restored or expected to be restored within 12 months of onset. Major function of the face and head is described in 1.00O.

20 C.F.R. Pt. 404, Subpt. P., App. 1 § 1.08 (2006).

Section 1.00M defines the phrase "under continuing surgical management," as follows:

> [S]urgical procedures and any other associated treatments related to the efforts directed toward the salvage or restoration of functional use of the affected part. It may include such factors as post-surgical procedures, surgical complications, infections, or other medical complications, related illnesses, or related treatment that delay the individual's attainment of maximum benefit from therapy. When burns are not under continuing surgical management, see 8.00F.

20 C.F.R. Pt. 404, Subpt. P., App. 1 § 1.00M (2006).

Claimant's left wrist injury involved the ligaments of his wrist, and therefore, may be considered under § 1.08 as a soft tissue injury. Claimant injured his left wrist on July 19, 2004, and

7

underwent a first surgical procedure on November 29, 2004. He developed a staph infection on December 5, 2004, and underwent additional surgery on December 8, 2004. Claimant's treating orthopedist, Dr. Ryu, noted on May 24, 2005, that there were no signs of infection and that his wound was well-healed. Thus, it appears that Claimant's "continuing surgical management" ceased at the latest, on May 24, 2005, which was only ten months from the date of his injury. Accordingly, it does not appear that Claimant meets the requirements of Listing § 1.08, and the Court finds that any error on the ALJ's part in failing to consider specifically his impairment under this section is harmless. Claimant otherwise has failed to cite to any specific Listing under which the ALJ failed to consider his impairments. Accordingly, the Court finds that the ALJ's decision that Claimant's impairments or combination of impairments did not meet a Listing level impairment is supported by substantial evidence.

2. Medical Source Opinions.

Second, Claimant alleges that the ALJ erred in failing to accord controlling weight to the August 15, 2005, opinion of Claimant's treating orthopedist, Dr. Ryu, that Claimant "continues to be temporarily and totally disabled." (Document No. 10 at 6-8.) Claimant asserts that the ALJ essentially ignored Dr. Ryu's opinion, which was well supported by clinical evidence and was consistent with other substantial evidence, and gave greater weight to the unsupported opinion of Dr. Mir. (Id.)

The Commissioner asserts that the ALJ reasonably determined that Dr. Ryu's opinion was not entitled to controlling weight because it was made three months after he last examined Claimant; was made in reference to Claimant's workers' compensation claim, which has a different legal standard than the Social Security Act; was an opinion on an issue reserved to the Commissioner; and

was inconsistent with the medical and opinion evidence of record, as well as with Dr. Ryu's own treatment notes. (Document No. 12 at 11-12.) Specifically, the ALJ notes that during the period at issue, Claimant was able to perform certain tasks requiring significant functional ability, such as preparing meals, driving or taking the bus, doing laundry, and performing light housework. (Id. at 12.) Additionally, Dr. Ryu noted in May, 2005, that Claimant's left wrist was healed, with no sign of infection and with good placement of the scaphulnate joint. (Id.) Finally, the Commissioner notes that Dr. Ryu's opinion was inconsistent with the opinions of Drs. Mir, Lim, and Reddy. (Id.)

At steps four and five of the sequential analysis, the ALJ must determine the claimant's residual functional capacity for substantial gainful activity. "RFC represents the most that an individual can do despite his or her limitations or restrictions." See Social Security Ruling 96-8p, 61 Fed. Reg. 34474, 34476 (1996). Pursuant to SSR 96-8p, the RFC assessment "must be based on all of the relevant evidence in the case record," including " the effects of treatment" and the "limitations or restrictions imposed by the mechanics of treatment; e.g., frequency of treatment, duration, disruption to routine, side effects of medication." Looking at all the relevant evidence, the ALJ must consider the claimant's ability to meet the physical, mental, sensory and other demands of any job. 20 C.F.R. §§ 404.1545(a), 416.945(a) (2006). "This assessment of your remaining capacity for work is not a decision on whether you are disabled, but is used as the basis for determining the particular types of work you may be able to do despite your impairment(s)." Id. "In determining the claimant's residual functional capacity, the ALJ has a duty to establish, by competent medical evidence, the physical and mental activity that the claimant can perform in a work setting, after giving appropriate consideration to all of her impairments." Ostronski v. Chater, 94 F.3d 413, 418 (8th Cir. 1996).

Opinions on a claimant's Residual Functional Capacity are issues that are reserved to the Commissioner. The Regulations state that:

> We use medical sources, including your treating source, to provide evidence, including opinions, on the nature and severity of your impairment(s). Although we consider opinions from medical sources on issues such as whether your impairment(s) meets or equals the requirements of any impairment(s) in the Listing of Impairments in appendix 1 to subpart P of part 404 of this chapter, your residual functional capacity . . . or the application of vocational factors, the final responsibility for deciding these issues is reserved to the Commissioner.

See 20 C.F.R. § 416.927(e)(2) (2006).

> In determining what a claimant can do despite his limitations, the SSA must consider the entire record, including all relevant medical and nonmedical evidence, such as a claimant's own statement of what he or she is able or unable to do. That is, the SSA need not accept only physicians' opinions. In fact, if conflicting medical evidence is present, the SSA has the responsibility of resolving the conflict.

Diaz v. Chater, 55 F.3d 300, 306 (7th Cir. 1995) (citations omitted).

The Regulations state that opinions on these issues are not medical opinions as described in the Regulation dealing with opinion evidence (20 C.F.R. §§ 404.1527(a)(2) and 416.927(a)(2)); rather, they are opinions on issues reserved to the Commissioner. 20 C.F.R. §§ 404.1527(e) and 416.927(e). For that reason, the Regulations make clear that "[w]e will not give any special significance to the source of an opinion on issues reserved to the Commissioner. . . ." Id. §§ 404.1527(e)(3) and 416.927(e)(3). The Regulations further provide that "[f]or cases at the Administrative Law Judge hearing or Appeals Council level, the responsibility for deciding your residual functional capacity rests with the Administrative Law Judge or Appeals Council." See 20 C.F.R. §§ 404.1545 and 416.946 (2006). However, the adjudicator must still apply the applicable factors in 20 C.F.R. § 416.927(d) when evaluating the opinions of medical sources on issues reserved to the Commissioner. See Social Securing Ruling ("SSR") 96-5p, 61 FR 34471, 34473

(1996).

Social Security Ruling 96-5p makes a distinction between an RFC assessment, which is "the adjudicator's ultimate finding of 'what you can still do despite your limitations,'" and a "'medical source statement,' which is a 'statement about what you can still do despite your impairment(s)' made by an individual's medical source and based on that source's own medical findings." Id. SSR 96-5p states that "[a] medical source statement is evidence that is submitted to SSA by an individual's medical source reflecting the source's opinion based on his or her own knowledge, while an RFC assessment is the adjudicator's ultimate finding based on a consideration of this opinion and all the other evidence in the case record about what an individual can do despite his or her impairment(s)." Adjudicators "must weigh medical source statements under the rules set out in 20 C.F.R. § 416.927, providing appropriate explanations for accepting or rejecting such opinions." Id. at 34474.

Every medical opinion received by the ALJ must be considered in accordance with the factors set forth in 20 C.F.R. §§ 404.1527(d) and 416.927(d) (2006). These factors include: (1) length of the treatment relationship and frequency of evaluation, (2) nature and extent of the treatment relationship, (3) supportability, (4) consistency, (5) specialization, and (6) various other factors. Additionally, the Regulations state that the Commissioner "will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion." Id. §§ 404.1527(d)(2) and 416.927(d)(2).

Under §§ 404.1527(d)(1) and 416.927(d)(1), more weight is given to an examiner than to a non-examiner. Sections 404.1527(d)(2) and 416.927(d)(2) provide that more weight will be given to treating sources than to examining sources (and, of course, than to non-examining sources).

11

Sections 404.1527(d)(2)(I) and 416.927(d)(2)(I) state that the longer a treating source treats a claimant, the more weight the source's opinion will be given. Under §§ 404.1527(d)(2)(ii) and 416.927(d)(2)(ii), the more knowledge a treating source has about a claimant's impairment, the more weight will be given to the source's opinion. Sections 404.1527(d)(3), (4) and (5) and 416.927(d)(3), (4), and (5) add the factors of supportability (the more evidence, especially medical signs and laboratory findings, in support of an opinion, the more weight will be given), consistency (the more consistent an opinion is with the evidence as a whole, the more weight will be given), and specialization (more weight given to an opinion by a specialist about issues in his/her area of specialty). Unless the ALJ gives controlling weight to a treating source's opinion, the ALJ must explain in the decision the weight given to the opinions of state agency psychological consultants. 20 C.F.R. §§ 404.1527(f)(2)(ii) and 416.927(f)(2)(ii) (2006). The ALJ, however, is not bound by any findings made by state agency medical or psychological consultants and the ultimate determination of disability is reserved to the ALJ. Id. §§ 404.1527(f)(2)(I) and 416.927(f)(2)(I).

In evaluating the opinions of treating sources, the Commissioner generally must give more weight to the opinion of a treating physician because the physician is often most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. See 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) (2006). Nevertheless, a treating physician's opinion is afforded "controlling weight only if two conditions are met: (1) that it is supported by clinical and laboratory diagnostic techniques and (2) that it is not inconsistent with other substantial evidence." Ward v. Chater, 924 F. Supp. 53, 55 (W.D. Va. 1996); see also, 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) (2006). The opinion of a treating physician must be weighed against the record as a whole when determining eligibility for benefits.  20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) (2006). Ultimately, it is the

responsibility of the Commissioner, not the court to review the case, make findings of fact, and resolve conflicts of evidence. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). As noted above, however, the Court must not abdicate its duty to scrutinize the record as a whole to determine whether the Commissioner's conclusions are rational. Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974).

If the ALJ determines that a treating physician's opinion should not be afforded controlling weight, the ALJ must then analyze and weigh all the evidence of record, taking into account the factors listed in 20 C.F.R. §§ 404.1527 and 416.927(d)(2)-(6).

The medical evidence reflects Claimant's treatment with Dr. Jaiyoung Ryu, M.D., from October 19, 2004, through May 24, 2005, as well as a medical note from Dr. Ryu dated August 15, 2005. (Tr. at 17-18, 178-99, 410-22, 423-27, 447-60, 498-99.) On October 19, 2004, Dr. Ryu conducted an orthopaedic evaluation of Claimant's left wrist pain. (Tr. at 193-94.) Claimant reported that he injured his left wrist at work on July 19, 2004, when he fell from a scaffold approximately three feet and landed on his outstretched left hand. (Tr. at 193.) Claimant immediately complained of left wrist pain but was able to finish the workday. (Id.) Later that day, Claimant presented to the emergency room at Greenbrier Valley Medical Center where x-rays were taken and Claimant was splinted and referred to Dr. Pack, who diagnosed scapholunate dissociation. (Id.) For workers' compensation coverage, Claimant was transferred to Dr. Ryu at West Virginia University. (Id.) Examination revealed neurovascularly intact bilateral upper extremities and some limited left wrist range of motion. (Id.) Claimant reported pain with wrist flexion and extension, as well as ulnar and radial deviation. (Tr. at 193-94.) Claimant also had pain with palpation over the dorsum of the wrist at the scapholunate interval and a positive Watson shift test on the left with increased instability

13

compared to the right. (Tr. at 194.) X-rays revealed obvious Terry Thomas sign with scapholunate interval widening, which suggested a scapholunate interosseous ligament tear and a DISI deformity. (Id.) Dr. Ryu assessed scapholunate dissociation and recommended left wrist arthroscopy. (Id.) On November 19, 2004, Dr. Ryu conducted a history and physical examination prior to surgery, and diagnosed left wrist scapholunate interosseous ligament tear. (Tr. at 188.) Claimant underwent surgery to repair the left wrist ligament on November 29, 2004. (Tr. at 188, 429.)

On December 1, 2004, Claimant presented to Greenbrier Valley Medical Center with a significant amount of swelling around the area of his short arm cast and complaints of pain. (Tr. at 169.) Dr. E. Jonathan Stout, D.O., opined that there was no neurovascular compromise and decided not to bivalve the cast. (Id.) Dr. Stout advised Claimant to elevate his arm, but to return to the emergency room if the swelling and pain did not improve. (Id.) Claimant returned to the emergency room later that night reporting unbearable pain and requesting that his cast be removed. (Tr. at 168.) Physical exam revealed some edema of the fingers but distal neuocirc appeared to be intact. (Id.) Dr. Stout bivalved his cast, reinforced it with an Ace bandage, and instructed Claimant to contact his orthopedist in the morning. (Id.) Claimant again presented to the emergency room on December 4, 2004, complaining of pain in his left hand, and presenting with a fever. (Tr. at 166-67.) Dr. John Johnson, D.O., removed the cast from his left hand, which revealed a "great deal of swelling but no pus or drainage from his surgical site from his pins." (Tr. at 166.) Dr. Johnson discussed Claimant's care with Dr. Lemley, who was on call for Dr. Ryu, and was advised to re-wrap his hand until they could see Claimant on December 6. (Id.) On December 5, 2004, blood cultures revealed a diagnosis of staph septicimeia of the left hand. (Tr. at 165.) Dr. Johnson therefore, called Claimant in and gave him antibiotics intravenously. (Id.)

14

On December 8, 2004, Claimant underwent surgery at the University Hospital and had debridement and removal of hardware. (Tr. at 185, 429.) Following this procedure, Claimant was prescribed antibiotics and given home health care assistance. (Tr. at 429.) Dr. Ryu re-examined Claimant on January 7, 2005, and found that Claimant's swelling and pain had improved. (Tr. at 185.) He had very minimal range of motion of the fingers and hand, which Dr. Ryu stated was to be expected from the swelling of the injury. (Id.) Dr. Ryu instructed Claimant to work on range of motion of the fingers and hand with the physical therapist, and placed him in a short arm cast for continued immobilization. (Id.)

Claimant was discharged by his home health care agency due to his noncompliance on February 10, 2005. (Tr. at 227.) At the time of discharge, the nurse noted that Claimant was free of infection and that his pain was managed. (Id.) On March 4, 2005, Claimant was examined by Dr. Ryu, after missing a couple of weeks of appointments. (Tr. at 415.) Dr. Ryu noted that Claimant removed his cast by himself on February 28, 2005, and that x-rays showed good positioning of the scaphoid with no gaping between the scaphoid and the lunate, with near normal height of the scaphoid. (Id.) Claimant's neurovascular status was intact though his fingers and wrist were very stiff. (Id.) On April 21, 2005, Dr. Ryu reported that Claimant was doing reasonably well, but was quite stiff. (Tr. at 414.) Therefore, he requested an additional six weeks of physical therapy working with his hand. (Id.) On May 24, 2005, x-rays demonstrated good positioning of the scapholunate joint. (Tr. at 413.) There was some osteopenic appearance of a couple of bones, which suggested that Claimant was not actively using his wrist, which Dr. Ryu found understandable given his discomfort. (Id.) Dr. Ryu encouraged Claimant to increase the use of his left wrist gradually and as pain tolerated. (Id.) Dr. Ryu noted: "I wonder if this is enough or we will have to do some further

15

surgical treatment, such as a wrist effusion if Mr. Graham continues to have a pain problem." (Id.)

Dr. Ryu opined that the wound was well-healed and that there was no sign of infection. (Id.)

In response to a letter from Workers' Compensation, Dr. Ryu opined in a letter dated August

15, 2005, that Claimant was temporarily and totally disabled. (Tr. at 498.) He noted that on his last

visit on May 24, 2005, Claimant complained of pain around the ulnar border of his wrist and small

finger. (Id.) Dr. Ryu stated:

> For us to give a final comment on Mr. Graham, we would need to wait until his next
> appointment on September 27th. At that time, we hope that we could allow him to
> return to work in some capacity. It has also been brought to our attention about the
> potential for doing a functional capacity evaluation, which would be okay at this
> time. However, it may be more relevant to do this after his last visit in September
> when we believe he should be able to begin the process of returning to work.

(Tr. at 498.)

In addition to Dr. Ryu's opinion, the record contains a July 8, 2005, evaluation by Dr. Saghir

R. Mir, M.D., and form Physical Residual Functional Capacity Assessments by Drs. Rogelio Lim,

M.D., and Uma P. Reddy, M.D., state agency reviewing physicians, on February 14, 2005, and

September 7, 2005, respectively. (Tr. at 402-09, 428-38, 439-46.) Dr. Mir noted Claimant's

complaints of aching, throbbing, and burning type pain over the dorsum of his wrist. (Tr. at 431.)

Claimant's pain however, was not constant, though it was persistent, occurring seventy-five percent

of the time. (Id.) Claimant reported that any mobility activity increased his symptoms, and that his

wrist swelled and hurt after he completed his two-hour therapy session. (Id.) Dr. Mir noted

significant restriction of mobility of the left wrist, as well as stiffness. (Id.) Claimant had generalized

weakness of the left hand and forearm area, but exhibited good mobility of the fingers. (Id.) On

physical examination, Claimant had normal muscle strength of both upper extremities but significant

limitation of range of left wrist motion, with discomfort at the extreme ranges. (Tr. at 433.) Dr. Mir

16

observed minimal swelling around the wrist area with generalized tenderness, especially over the dorsal aspect of the wrist. (Id.) Phalen's test was not performed so as to avoid any discomfort. (Id.) Claimant had some numbness in his index finger and left palm. (Tr. at 434.)

In summary, Dr. Mir noted that Claimant had "significant limitation of ROM at left wrist with mild atrophy of forearm muscles, which went along with a restriction of mobility. He had some numbness in his left palm and index finger area." (Tr. at 434.) Dr. Mir assessed status post-op surgery, left wrist and opined that Claimant had "reached maximum degree of medical improvement. At the time of examination, he was not found to be temporarily totally disabled." (Id.) He noted that if Claimant's symptoms persisted, he probably would need surgical fusion or arthrodesis of his left wrist at some stage. (Tr. at 435.) He found that Claimant had a ten percent wholeman impairment from his left wrist. (Id.)

On February 14, 2005, Dr. Lim opined that Claimant was capable of performing light exertional work, with occasional postural limitations and an avoidance of concentrated exposure to vibration and hazards. (Tr. at 403-04, 406.) Dr. Lim further opined that Claimant's abilities to handle, finger, and feel were limited due to infection of the left hand. (Tr. at 405.) Dr. Lim opined that though Claimant was "for the moment restricted with the use of left hand . . . being right handed dominant he can still do light work." (Tr. at 407.)

On September 7, 2005, Dr. Reddy opined that Claimant was capable of performing light work that involved no climbing ladders, ropes, or scaffolds; only occasional balancing and crawling; and frequent climbing ramps or stairs, stooping, kneeling, and crouching. (Tr. at 440-41.) She further opined that Claimant had moderate to severe manipulative limitations to use the left hand properly. (Tr. at 442.) She further opined that Claimant should avoid concentrated exposure to hazards. (Tr.

at 443.) Though Dr. Reddy considered Dr. Mir's evaluation of Claimant, there is no indication that she reviewed or considered Dr. Ryu's August 15, 2005, opinion letter. (Tr. at 446.)

In his decision, the ALJ summarized the medical and opinion evidence of record and accorded little weight to the August 15, 2005, opinion of Dr. Ryu that Claimant continued to be "temporarily and totally disabled." (Tr. at 17-18.) The ALJ noted that Dr. Ryu's opinion was given in response to a letter from Workers' Compensation, which had "different legal standards for disability and compensation than under the Social Security Act." (Id.) Additionally, the ALJ noted that such opinion was not a medical opinion, but was "administrative findings" on an issue reserved to the Commissioner. (Id.)

In Yost v. Barnhart, 79 Fed. Appx. 553, 556, 2003 WL 22417516 at *2 (4th Cir. 2003) (per curiam), the Court, in affirming the district court's order denying benefits, stated that the standard for disability under the Social Security Act was entirely different than the West Virginia Workers' Compensation laws, and therefore, "a state award of benefits does not bind us in establishing proof of disability for DIB purposes." Furthermore, 20 C.F.R. § 404.1504 provides as follows:

> A decision by any nongovernmental agency or any other governmental agency about whether you are disabled or blind is based on its rules and is not our decision about whether you are disabled or blind. We must make a disability or blindness determination on social security law. Therefore, a determination made by another agency that you are disabled or blind is not binding on us.

In view of the foregoing, the Court finds that the ALJ's decision to give little weight to Dr. Ryu's opinion because it was based on standards beyond the Social Security Act, is supported by substantial evidence. Furthermore, pursuant to 20 C.F.R. § 404.1527(e), Dr. Ryu's opinion regarded an issue reserved to the Commissioner, and therefore, was considered an administrative finding dispositive of the case rather than a medical opinion.

18

As the Commissioner notes, Dr. Ryu's "opinion" also was not entitled significant weight because it was inconsistent with the probative evidence of record. Despite Claimant's left wrist injury, he retained full use of his dominant right hand at all times, and had no sitting, standing, or walking limitations during the relevant period of time. (Tr. at 157, 433-34, 511.) Additionally, at the time of his discharge from home health care assistance, it was noted that Claimant was functionally capable of driving or using public transportation, doing laundry, performing light housekeeping tasks independently, and planning and preparing light meals for himself independently. (Tr. at 223.) In a form  Function Report dated January 14, 2005, Claimant reported that he did laundry and shopped for groceries and clothing on a weekly basis. (Tr. at 88-89.) Finally, Dr. Ryu's "opinion" was inconsistent with the opinions of Drs. Mir, Lim, and Reddy. Though neither Dr. Lim nor Dr. Reddy considered Dr. Ryu's opinion, it is clear that based on Claimant's ability to use his right dominant hand, he was capable of performing light exertional work. Accordingly, the undersigned finds that the ALJ's decision to accord little weight to the opinion of Dr. Ryu is supported by substantial evidence of record.

3. Vocational Expert Testimony.

Finally, Claimant alleges that the ALJ erred in relying on the VE's opinion that Claimant "could perform some duties even while undergoing therapy and treatment for his injuries." (Document No. 10 at 8.) Claimant asserts that the ALJ's hypothetical question to the VE omitted "the fact that the claimant could not be physically present at employment while undergoing the substantial therapy, as seen from the records in this claim which show time consuming nature of that therapy." (Id.) The Commissioner asserts that there is no evidence that Claimant's "attendance at physical therapy would aversely affect his ability to perform work for eight hours a day." (Document

19

No. 12 at 12.) The Commissioner points out that Claimant's physical therapy provider, Greenbrier Valley, advertises on its website that "it offers physical therapy appointments before 8:00 a.m. and after 5: p.m." (Id. at 13.) Thus, the Commissioner contends that Claimant's allegation that he could not work due to physical therapy is without merit. (Id.)

To be relevant or helpful, a vocational expert's opinion must be based upon consideration of all evidence of record, and it must be in response to a hypothetical question which fairly sets out all of the claimant's impairments. Walker v. Bowen, 889 F.2d 47, 51 (4th Cir. 1989). "[I]t is difficult to see how a vocational expert can be of any assistance if he is not familiar with the particular claimant's impairments and abilities – presumably, he must study the evidence of record to reach the necessary level of familiarity." Id. at 51. Nevertheless, while questions posed to the vocational expert must fairly set out all of claimant's impairments, the questions need only reflect those impairments that are supported by the record. See Chrupcala v. Heckler, 829 F.2d 1269, 1276 (3d Cir. 1987). Additionally, the hypothetical question may omit non-severe impairments, but must include those which the ALJ finds to be severe. See Benenate v. Schweiker, 719 F.2d 291, 292 (8th Cir. 1983).

In the ALJ's hypothetical questions to the VE, he included all of Claimant's impairments that were supported by the record. (Tr. at 515-19.) The ALJ first asked whether it would be difficult for a one-armed person to perform Claimant's past relevant work. (Tr. at 515.) The VE responded that there were clerical and watch/gate guard jobs that someone with good control of their dominant hand could perform. (Tr. at 516-17.) The VE identified the jobs of a watch/gate guard, parking lot attendant, general office clerk, and file clerk. (Id.) The ALJ then asked whether someone who had to attend physical therapy for one and one half hours a day could perform the identified jobs. (Tr.

20

at 517.) The VE responded that such a person could work the normal hours for a workday and schedule the physical therapy around the job, such as in the evening. (Tr. at 518.) Claimant's counsel then asked the VE whether an individual having to attend to his own therapy exercises without going to a physical therapist, would be able to perform any of the identified jobs. (Tr. at 518-19.) The VE responded that if the exercises were performed outside the normal work breaks, then the individual would not be able to perform any work. (Tr. at 519.) The VE noted that the employer would not accommodate the extra time for therapy exercises and that the Agency did not look at job accommodations as substantial gainful activity. (Id.)

Based on the VE's testimony that physical therapy could be scheduled around Claimant's employment, and in the absence of evidence to the contrary, the Court finds that the ALJ properly relied on the VE's testimony in finding Claimant not to be disabled.

After a careful consideration of the evidence of record, the Court finds that the Commissioner's decision is supported by substantial evidence. Accordingly, by Judgment Order entered this day, the Plaintiff's Motion for Judgment on the Pleadings (Document No. 9.) is **DENIED**, Defendant's Motion for Judgment on the Pleadings (Document No. 12.) is **GRANTED**, the final decision of the Commissioner is **AFFIRMED**, and this matter is **DISMISSED** from the docket of this Court.

The Clerk of this Court is directed to send a copy of this Memorandum Opinion to counsel of record.

ENTER: March 30, 2009.

R. Clarke VanDervort
United States Magistrate Judge

21